# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*In re Marriage of Levinson*, 2013 IL App (1st) 121696

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF ROBIN MITCHELL LEVINSON, Petitioner-Appellee, and ROBERT LEVINSON, Respondent-Appellant. |
| District & No. | First District, Fourth Division<br>Docket Nos. 1-12-1696, 1-12-2489 cons. |
| Filed | May 2, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an unusually litigious marriage dissolution action, the trial court did not abuse its discretion in ordering respondent to pay $78,500 in interim fees for petitioner based on consideration of the statutory factors and the financial information indicating that respondent controlled the marital assets and had the means to pay the fees, but the contempt order was vacated due to infirmities, including the finding that respondent was guilty of indirect, rather than direct, contempt and the provisions making payment of the fees the purge amount as well as a sanction. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-D-4934; the Hon. Kathleen Kennedy and the Hon. Jeanne Cleveland Bernstein, Judges, presiding. |
| Judgment | Affirmed in part and vacated in part. |

| Counsel on Appeal | Brian J. Hurst, Olga A. Allen, and Olga Stambler, all of Hurst, Robin & Kay, LLC, of Chicago, for appellant. |
| | |
| | Michael G. DiDomenico, Alan J. Toback, and Amanda M. Oliver, all of Lake Toback, of Chicago, for appellee. |

| Panel | JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion. |
| | Presiding Justice Lavin and Justice Epstein concurred in the judgment and opinion. |

**OPINION**

¶ 1     In this predecree dissolution of marriage case, respondent Robert Levinson appeals from orders of the circuit awarding interim attorney fees to petitioner Robin Mitchell Levinson and from the subsequent finding that Robert was in indirect civil contempt for failure to comply with the order. A subsequent body attachment issued against Robert for his failure to pay the monetary penalty imposed. On appeal, Robert contends the trial court abused its discretion by: (1) denying his request for an evidentiary hearing and subsequently awarding Robin's counsel $78,500 in interim attorney fees where there allegedly existed no source of funds from which the fee award could be paid; and (2) finding Robert in indirect civil contempt for his failure to pay the court-ordered interim attorney fees. For the following reasons, we affirm in part and vacate in part.

¶ 2                          I. BACKGROUND

¶ 3     The parties are involved in a contentious dissolution of marriage. This litigation has an extensive procedural history. This is the second time the parties have been before this court during the course of this dissolution. Previously, we reversed the circuit court's order granting the wife's petition for exclusive possession of the marital residence, finding it unsubstantiated by the evidence. See *In re Marriage of Levinson*, 2012 IL App (1st) 112567.[1] The parties were married in 2004 and have two young children: Bennet, born in 2007, and Jacob, born in 2005. Both Bennet and Jacob have special needs; Jacob has been diagnosed with sensory processing disorder and dyspraxia, and Bennet was, at the time the record was made, currently being tested for sensory processing disorder. Throughout the marriage, the parties lived together with their children at the marital residence.

---

[1]A portion of the fact section of this opinion is taken from the previous opinion issued by this court in *In re Marriage of Levinson*, 2012 IL App (1st) 112567.

¶ 4    In May 2010, Robin filed a petition for dissolution of marriage, alleging irreconcilable differences. She asked for full custody of the children, as well as exclusive possession of the marital residence. The court appointed a child representative and also began what the parties referred to as a "birdnesting" schedule, wherein each party occupied the marital residence during his or her parenting time, but vacated it during the other's parenting time. More specifically, the court granted Robin exclusive possession of the marital residence except during Robert's parenting time, during which Robin was required to vacate the residence.

¶ 5    In June 2010, Robert filed a counterpetition for dissolution of marriage in which he, too, requested custody of the children. In July 2011, Robin filed a motion requesting, in pertinent part, exclusive possession of the marital residence at all times. After a multiday hearing, the court granted the motion, finding that the birdnesting arrangement jeopardized the mental well-being of Robin and the children. Robert filed an interlocutory appeal in which he asked this court to reverse the order of the circuit court.

¶ 6    In that appeal, this court considered the meaning of "jeopardy" found in section 701 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/701 (West 2010)). *In re Marriage of Levinson*, 2012 IL App (1st) 112567, ¶¶ 32-44. On review, we "recognize[d] the trial court's concern that possession of the marital residence [was] being used as a tool in the arsenals of Robert and Robin, two individuals involved in a contentious divorce," but noted that we are required to follow the statutory language. *In re Marriage of Levinson*, 2012 IL App (1st) 112567, ¶ 44. We held that the determination of jeopardy was error, and reversed the judgment of the circuit court. *In re Marriage of Levinson*, 2012 IL App (1st) 112567, ¶ 44.

¶ 7    Meanwhile, in April 2011, Robin filed a petition in the circuit court in which she requested the court order Robert to pay approximately $125,000 for Robin's interim and prospective fees and costs. In this petition, she alleged that she had spent approximately $15,000 on attorney fees, that she had an outstanding balance due and owing her attorneys of $25,000, and that her estimated reasonable and necessary prospective attorney fees would total no less than $100,000. She alleged, *inter alia*:

"8. ROBIN is the primary caretaker of the minor children and has been dependent on ROBERT for her support during their marriage. ROBIN does not have the financial ability to pay her attorneys' fees, expert fees, and other court costs.

9. ROBERT, conversely, is capable of discharging this Court's order for interim and prospective attorney's fees and costs. ROBERT is the owner and/or shareholder in numerous businesses, corporations, and/or entities, and he has access to or control of substantial assets and income.

10. ROBIN cannot hope to litigate this matter on a level playing field with ROBERT without a substantial contribution for the payment of her attorneys' fees and court costs and expert witness fees and costs by ROBERT."

¶ 8    Robert then filed a response to the petition in which he asked court to deny Robin's petition, compel Robin to seek employment, compel Robin to pay specific attorney fees and costs incurred by Robert, and order a disgorgement of attorney fees in favor or Robert. He alleged, *inter alia*, that he provides $2,500 in monthly support to Robin, in addition to other

financial support such as her housing costs, health insurance, automobile insurance, and utilities. He stated he believes Robin has "sufficient access to funds to cover her own legal fees and costs." He also argued that some of Robin's attorney fees and costs were not reasonable or necessary. He alleged that Robin is a licensed attorney in the State of Illinois and that she should seek "appropriate employment to cover her own legal fees and expenses." He explained that he works in the real estate market, but has not earned funds from the sale or purchase of real estate since 2008. He alleged he has used funds secured from family members to support himself and Robin. Regarding attorney fees, Robert stated:

"22. Robert Levinson has paid approximately $53,000.00 to Swanson, Martin & Bell, LLP and $5,955.50 to Brian Hurst for a total of approximately $59,455.50.00. Robert Levinson owes $4,173.00 to Brian Hurst (through 3/31/11) and $14,412.95 to Swanson, Martin & Bell, LLO (which may be higher to account for more recent fees and costs).

23. Robin Levinson has paid $55,375.00 to the law firm of Katz, Goldstein & Warren, $15,000.00 to the law firm of Lake Toback, and $7,500.00 to Lee Gould (her financial expert) for a total of $77,875.00.

24. Robin Levinson has paid more attorneys' fees and costs tha[n] Robert Levinson by the sum of $18,419.50, and therefore, there is no 'field' to 'level.'

25. That under the Level the Playing Field principal, the Court has authority to order a disgorgement of attorneys' fees and costs in favor of Robert Levinson."

¶ 9 On July 18, 2011, the circuit court heard oral arguments from the parties and ordered:

"(1) [Robert] shall pay the sum of $100,000 to Lake Toback as and for the court ordered award of interim and prospective attorneys fees within 30 days, without prejudice.

(2) From said [$]100,000 Dr. Palen shall receive his costs for deposition and trial testimony and preparation in connection with the hearing on Robin's petition for modification filed 7/14/2011.

(3) Howard D. Roseberg shall be paid approx. [$]13,000 upon presentation of his statement.

* * *

(5) The award above is entered per 750 ILCS 5/501(c-1) over Robert's counsel's objection and demand for evidentiary hearing."

¶ 10 Robert then filed a motion to reconsider, arguing that the court erred in ordering him to pay $100,000 to Robin's counsel for interim and prospective attorney fees, and "at no time did the Court permit a full hearing. The court did not allow any testimony of parties or any presentation of evidence." He argued that Robin failed to present adequate evidence to make a showing that she did not have the ability pay her own fees and that Robert does not have the ability to make the payment. He claimed he had "no liquidity," that he had incurred debt in the amount of $165,000 since the beginning of the litigation, and that he is required to borrow money to cover the family and household expenses. He also argued that Robin's counsel and experts had been "substantially paid more than Robert's attorneys," and that Robin has "in excess of $100,000 in a retirement account that could be liquidated."

¶ 11 The court agreed to reconsider its decision and ordered the parties to submit "memos setting forth amounts due; amounts paid for fees; resource of the funds; updated [financial disclosure statements], or other current financial info of each party; and respective positions regarding payment of fees." The parties did so.[2] Robert filed several documents, including: a memo describing his financial situation, including a description of assets available to pay for ongoing litigation costs; an updated financial disclosure statement; addendum lists of marital assets and liabilities, and premarital and nonmarital assets; Robert's projected annual income statement; a table showing the parties' cash or cash equivalents; a table showing the parties' liabilities; a statement of contingent liabilities; a table reflecting attorney fees for both parties in the dissolution litigation; Robert's 2010 tax returns; a statement of liabilities; a statement of assets; a statement of business interests reflecting loans advanced by Robert to affiliated real estate limited liability companies; Robert's business monthly income and expense statement; a statement reflecting rental income for 2009-10; and a table showing real estate owned (both individually and in various shared ownership situations).

¶ 12 Robin submitted an updated financial disclosure statement as well as a memorandum in support of her petition for interim fees, which included: a table showing attorney and expert fees and costs due and paid by both parties; a section explaining that Robin did not have the ability to pay attorney and expert fees and costs which included the statement that Robin had already liquidated her nonmarital individual retirement account (IRA) to pay attorney fees; as well as a table showing the "balance of funds Robin has received to supplement her income;" a section purporting to show that Robert had the ability to pay the attorney fees and costs, which noted that Robert's net worth in May 2011, as reflected in his personal financial statement, was $1,737,000; and including a table reflecting properties in which Robert maintains an interest. In addition, Robin provided Robert's financial statement he made with First Eagle Bank dated May 1, 2011, in which he reported having a net worth of $1,737,000, as well as another of Robert's personal financial statements dated April 15, 2010, in which he reported having a net worth of $8,909,000.

¶ 13 On March 16, 2012, the court granted the motion to reconsider without prejudice, and awarded Robin $78,500 from Robert as an "interim award for attorneys' and experts' fees without prejudice and as an advance from the marital estate." Robert was ordered to pay this amount to Robin's attorneys no later than April 2, 2012. In its memorandum order, the court noted:

"After hearing argument in February 2012 the court declined to conduct the evidentiary hearing requested by [Robert], finding no good cause shown to do so, but granted reconsideration, and ordered the parties to submit specific information."

¶ 14 It then addressed the requirements of section 501(c-1) of the Act, which provides for interim fees as temporary relief, and stated:

---

[2]Initially, Robert filed his opening brief without including these documents. One month later, however, the parties presented copies of these documents to the court and entered into a stipulation that they should be made part of the record on appeal. These documents are now before us as part of the record on appeal.

"6. The following reflects, in part, the court's consideration of the statutory factors based on the parties' submissions, reasonable inferences from the submissions, and the court's familiarity with the case:

(A) the income and property of each party, including alleged marital property within the sole control of one party and alleged non-marital property within access to a party

Petitioner is a licensed attorney who works sporadically as an arbitrator and has not been employed full-time outside the home since the birth of the parties' first child. Respondent's income supports the family and far exceeds Petitioner's earnings from occasional work. Respondent is a successful real estate professional whose business suffered financially after the 2008 downturn in the U.S. economy. It is undisputed here that the marital estate and Respondent's alleged non-marital estate includes real estate holdings. The complex nature of this property, and the time that would be needed to prepare and present evidence about the character and value of the property is one reason the court did not find good cause for an evidentiary hearing on interim fees. Respondent made various financial arrangements after 2008 to maintain the marital, as well as his alleged non-marital real estate holdings. The parties paid their living expenses and some of their attorneys' and experts' fees from income tax refunds that are now depleted.

Respondent solely controls the alleged marital property. Respondent has not accessed directly his alleged non-marital assets to pay attorneys' and experts' fees. Petitioner, in contrast, accessed her alleged non-marital property to pay fees, specifically, a retirement asset, receiving $37,258.52 and paying $32,500, with a large portion taken for taxes and penalties, and a savings account, receiving and paying approximately $46,000. She has not yet accessed her sole remaining alleged non-marital asset, deferred compensation valued in February 2012 at approximately $28,000. At this point there are no liquid marital assets, and no liquid non-marital assets of Respondent.

*(B) the needs of each party*

Based on the litigiousness they have displayed so far, both parties need exorbitant funds to finance their divorce litigation. Petitioner has spent more so far, but she is not the party in control of the marital assets and the information about them. The undisputed pattern here is that Respondent alone supports the family financially.

*(C) the realistic earning capacity of each party*

Although the future may be different, Petitioner's current realistic earning capacity, especially during contentious divorce litigation while primary caregiver of two young special needs children, is low, and Respondent's, despite the economic downturn, is high.

*(D) any impairment to present earning capacity of either party, including age and physical and emotional health*

Petitioner's present earning capacity is limited based on her marital role as primary caregiver for the parties' two sons.

*(E) the standard of living established during the marriage*

The parties established a '1%-lifestyle' standard of living during the marriage. They may have reduced expenses to some degree after 2008. However, since these proceedings

-6-

began almost two years ago both parties have, consistent with that marital lifestyle, incurred over half a million dollars in attorneys' and experts' fees. Although they may say otherwise, the only reasonable inference from the parties' conduct is that they both believe that the marital estate has sufficient assets to finance their litigation. Respondent, not Petitioner, controls the marital assets.

*(F) the degree of complexity of the issues, including custody, valuation or division (or both) of closely held businesses, and tax planning, as well as reasonable needs for expert investigations or expert witnesses, or both*

There is no dispute that this case involves complex issues that require experts.

*(G) each party's access to relevant information*

Based on his control of the real estate which is alleged to include marital and non-marital property, Respondent has easier access to relevant information about the property.

*(H) the amount of the payment or payments made or reasonably expected to be made to the attorney for the other party*

It is undisputed that as of February 2012, over $100,000 has been paid to Petitioner's attorneys, over $60,000 to Respondent's attorneys, and over $30,000 to the court-appointed child representative. It is also undisputed that the parties have spent more than $40,000 on expert fees. Petitioner alleges that she has incurred additional fees in excess of $150,000. Respondent alleges that he has incurred additional fees in excess of $100,000. The child representative asserts that he is owed $39,925 for services through February 15, 2012. To date the parties paid fees, in approximate amounts, from (1) tax refund income, $108,867, (2) other income, $12,995, (3) credit cards, $14,750, (4) loans, $21,750 ($10,000 from Petitioner's family, $11,750 from Respondent's family), and (5) Petitioner's alleged non-marital assets, $78,500.

*(I) any other factor that the court expressly finds to be just and equitable*

It is just and equitable to consider the following additional factors:

(1) regardless of the liquidity of the marital property it must and will be divided equitably by agreement or by the court, meaning that specific property, or cash in lieu of specific property, will be transferred to Petitioner from Respondent, (2) it is impossible to determine at this point what, if any, portion of the tax refunds which have been used to support the marital lifestyle and to pay about $108,867 of attorneys' and experts' fees, may be characterized as Respondent's non-marital property, (3) Respondent has at least $78,500 in alleged non-marital assets which are not liquid, but, which, in light of Respondent's experience and profession, he may access indirectly, and (5) both parties have demonstrated the ability to obtain loans from family members."

The court acknowledged that it "struggled to apply section 501(c-1)(3) appropriately because, although the parties are willing to spend substantial amounts of money to litigate this dissolution "from which it is reasonable to infer that the marital estate can absorb these costs and thus that the parties are *able* to spend enormous amounts," conversely, the depletion of income and assets and the lack of liquidity "suggests that '[b]oth parties lack financial ability or access to assets or income for reasonable attorney's fees and costs.' " (Emphasis in

-7-

original). It noted, however, that "a key word may be 'reasonable,' and while the fees charged may be reasonable, it is not reasonable to pay and incur fees at the level of this case unless you can afford to do so." It stated:

> "After considering all the factors, Respondent, who has access to alleged non-marital real estate holdings of undetermined value, has the financial ability to pay additional amounts, and Petitioner lacks sufficient access to assets or income for additional amounts. Petitioner should not be required to spend all of her alleged non-marital assets without the playing field being leveled with regard to the direct use of alleged non-marital assets. Therefore, Respondent should be required to pay $78,500 for Petitioner's interim and prospective fees. Because of the length of time the issue has been pending without payment, Respondent should have only until April 2, 2012 to make this payment to Petitioner's attorneys. Alternatively, both parties lack financial ability or access to assets or income for reasonable attorney's fees and costs. Funds of at least $78,500 are available to Respondent indirectly, that is, through loans or other financing, and substantial parity requires Respondent to pay Petitioner's attorneys this amount."

¶ 15    Robert did not pay the interim fee award as ordered. Robin filed an emergency petition for rule to show cause for indirect civil contempt, alleging that Robert had wilfully refused to abide by the court's order. On April 3, 2012, the court issued a rule to show cause against Robert as to why he should not be held in contempt of court for his failure to comply with the March 16 order. Robert filed a response to the petition for rule to show cause on April 16, 2012, alleging he was unable to pay the court-ordered $78,500.

¶ 16    On June 4, 2012, the trial court found Robert in indirect civil contempt for his failure to pay the fee award:

> "Robert Levinson is found in indirect civil contempt of court for his wilful failure to comply with the court order of 2/16/12. *** He may purge the contempt by paying to [Robin's attorneys] $78,500 within 14 days."

Robert still did not pay the $78,500 within the required time.

¶ 17    On June 6, Robert filed a notice of appeal from the circuit court's June 4 order, which appeal was docketed in this court as case number 1-12-1696. Additionally, on June 20, Robert filed in the circuit court a motion for stay of the order of contempt pending appeal. The court heard argument on the motion for stay, then entered an order denying the motion, specifically finding that the purge amount is a "sanction."

¶ 18    Thereafter, Robin filed a motion to reconsider the June 20 order, requesting a hearing and asking the court to imprison Robert as a sanction for his failure to comply with the court's fee order. She argued that the only way the court could force Robert to pay the ordered amount would be to imprison him. A different trial judge heard this motion. That court granted the motion to reconsider and ordered that the $78,500 amount be "converted back to a purge," stating:

> "Petitioner's motion for reconsideration is granted and the amount of $78,500 is hereby converted back to a purge (no longer a sanction) based on the court's previous finding of contempt against Respondent."

¶ 19    The court gave Robert until August 21, 2012 to pay the purge.

¶ 20      Robert again failed to pay the purge. On August 28, 2012, the court issued a body attachment against Robert for failure to pay. Bond was set at $12,000. Robert filed a notice of appeal[3], which appeal was docketed in this court as case number 1-12-2489.

¶ 21      This appeal follows.

¶ 22                              II. ANALYSIS

¶ 23                             A. Interim Attorney Fees

¶ 24      On appeal, Robert first contends that the trial court abused its discretion when it awarded Robin's counsel $78,500 in interim attorney fees where Robert allegedly could not afford to pay said fees. Specifically, Robert argues that the court misapplied section 501(c-1)(3) of the Act (750 ILCS 5/501(c-1)(3) (West 2010)). Robert also argues that the trial court abused its discretion when it denied his requests for an evidentiary hearing regarding the interim attorney fees. We disagree.

¶ 25      Initially, we acknowledge Robin's contention that this court should presume the circuit court's orders were entered in conformity with the law because Robert failed to provide a sufficiently complete record on appeal by failing to include either a transcript or a bystander's report from the relevant hearing dates. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (In the absence of a complete record, we presume that the trial court's orders conformed to the law and "had a sufficient factual basis."); see also *In re Marriage of Rogers*, 213 Ill. 2d 129, 140 n.2 (2004). While we agree that the appellate record and Robert's brief could be more thorough and more precise, in this specific situation, we find that the record before us, which includes the bound record from an appeal that was previously before this court, a supplemental record of the relevant filings in the court below regarding the interim attorney fees, as well as a detailed memorandum opinion by the circuit court, is sufficient for our review of this issue.

¶ 26      In addition, Robin brings to this court's attention various errors, misrepresentations of the record, and failure to cite to the record in Robert's brief. She asks us to dismiss the appeal based on these errors and omissions. We agree that Robert's brief fails to comply with the requirements of Illinois Supreme Court Rule 341 (eff. July 1, 2008). That rule provides that all briefs should contain a fact section which includes "appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6). In the present case, Robert failed to cite to the record in portions of his brief and, at times, misrepresented what occurred in the court below. The rules of procedure concerning appellate briefs are rules, not mere suggestions, and it is within the appellate court's discretion to strike a brief and dismiss the appeal for failure to comply with those rules. See *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999). However, we find that appellant's lack of compliance with Rule 341(h)(6) does not preclude our review, as the errors are not dispositive to our decision. Accordingly, despite these deficiencies, we will not dismiss the appeal.

¶ 27      Turning to the merits of Robert's argument, section 501(c-1) permits a trial court to

---

[3]This court subsequently consolidated these two appeals into the instant appeal.

assess attorney fees and costs in favor of the petitioning party's counsel while the case is still pending. 750 ILCS 5/501(c-1) (West 2010). In pertinent part, section 501(c-1) provides:

"§ 501. Temporary Relief. In all proceedings under this Act, temporary relief shall be as follows:

\* \* \*

(c-1) As used in this section (c-1), 'interim attorney's fees and costs' means attorney's fees and costs assessed from time to time while a case is pending, in favor of the petitioning party's current counsel, for reasonable fees and costs either already incurred or to be incurred, and 'interim award' means an award of interim attorney's fees and costs. Interim awards shall be governed by the following:

(1) Except for good cause shown, a proceeding for (or relating to) interim attorney's fees and costs in a pre-judgment dissolution proceeding shall be nonevidentiary and summary in nature. All hearings for or relating to interim attorney's fees and costs under this subsection shall be scheduled expeditiously by the court. When a party files a petition for interim attorney's fees and costs supported by one or more affidavits that delineate relevant factors, the court (or a hearing officer) shall assess an interim award after affording the opposing party a reasonable opportunity to file a responsive pleading. A responsive pleading shall set out the amount of each retainer or other payment or payments, or both, previously paid to the responding party's counsel by or on behalf of the responding party. In assessing an interim award, the court shall consider all relevant factors, as presented, that appear reasonable and necessary, including to the extent applicable:

(A) the income and property of each party, including alleged marital property within the sole control of one party and alleged non-marital property within access to a party;

(B) the needs of each party;

(C) the realistic earning capacity of each party;

(D) any impairment to present earning capacity of either party, including age and physical and emotional health;

(E) the standard of living established during the marriage;

(F) the degree of complexity of the issues, including custody, valuation or division (or both) of closely held businesses, and tax planning, as well as reasonable needs for expert investigations or expert witnesses, or both;

(G) each party's access to relevant information;

(H) the amount of the payment or payments made or reasonably expected to be made to the attorney for the other party; and

(I) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/501(c-1) (West 2010).

When the legislature enacted section 501(c-1), its goal was to " 'level the playing field by equalizing the parties' litigation resources where it is shown that one party can pay and the other party cannot.' " *In re Marriage of Nash*, 2012 IL App (1st) 113724, ¶ 5 (quoting *In re*

*Marriage of Beyer*, 324 Ill. App. 3d 305, 315 (2001)).

¶ 28   For one party to pay interim fees to the other party, the court must find "that the party from whom attorney's fees and costs are sought has the financial ability to pay reasonable amounts and that the party seeking attorney's fees and costs lacks sufficient access to assets or income to pay reasonable amounts." 750 ILCS 5/501(c-1)(3) (West 2010); *In re Marriage of Beyer*, 324 Ill. App. 3d at 320 ("the party seeking fees must demonstrate the inability to pay and the ability of the other party to pay both parties' fees"). This court has explained that the purpose of allowing interim fees is to prevent the party in control of the assets to force the other into ceding valid claims because that party cannot pay attorneys and experts to adequately prosecute his or her case. *In re Marriage of Beyer*, 324 Ill. App. 3d at 316.

¶ 29   We first note that the court's order awarding interim attorney fees under section 501(c-1) of the Act is an interlocutory order which is not generally a final or appealable order. *In re Marriage of Radzik*, 2011 IL App (2d) 100374, ¶ 45. "However, when a party appeals from a contempt sanction imposed for violating an interim fee order, the contempt finding is final and appealable and presents to the reviewing court the propriety of the underlying order." *Id.* Accordingly, we review this interlocutory appeal and find no abuse of discretion in the trial court's interim award.

¶ 30   On appeal, Robert briefly argues that an evidentiary hearing should have been conducted on Robin's interim fee petition. In the "issue presented on appeal" section of his brief, Robert lists as his first issue: "Whether it was an abuse of the trial court's discretion to award Robin's counsel $78,500 in interim attorney's fees where there existed no source of founds from which the fee award could be paid and the trial court denied Robert's requests for an evidentiary hearing." In the body of his brief, however, Robert fails to fully develop this argument, arguing only: "Similarly to *Radzik*, good cause was shown to hold an evidentiary hearing and the court abused its discretion by awarding Robin $78,500 while receiving no evidence that Robin lacked the ability to pay her attorney's fees, that Robert was able to pay said amount, or that the marital estate had sufficient assets to pay said amount." In his reply brief on appeal, Robert "acknowledge[d] that under the language of 750 ILCS 5/501(c-1), hearings are generally non-evidentiary in nature" but argued:

> "this must be predicated by certain qualifications, i.e., 'reasonable attorney fees may be properly determined by a non-evidentiary proceeding *if* the trial court can determine from the evidence presented in the petition and response what amount would be a reasonable award.' *In re Marriage of Radzik*, 2011 IL App (2d) 100374. In this instance the trial court misapplied [subsection (c-1)] by assessing an interim attorneys' fee award against Robert when no evidence had been submitted that Robert has the ability to pay $78,500 in legal fees, and the court did not elect to conduct an evidentiary hearing."

Although Robert argues that "good cause" was shown to hold an evidentiary hearing in this matter, he fails to articulate to what good cause he refers. Conducting an evidentiary hearing on an interim fee petition in a predecree dissolution of marriage case is the exception not the rule; the statute clearly provides that "[e]xcept for good cause shown, a proceeding for (or relating to) interim attorney's fees and costs in a pre-judgment dissolution proceeding shall be nonevidentiary and summary in nature." 750 ILCS 5/501(c-1)(1) (West 2010). Here, the

court found no good cause to conduct an evidentiary hearing. It noted:

> "After hearing argument in February 2012 the court declined to conduct the evidentiary hearing requested by Respondent, finding no good cause shown to do so, but granted reconsideration, and ordered the parties to submit specific information."

It explained one of its reasons for declining to hold an evidentiary hearing:

> "The complex nature of this property, and the time that would be needed to prepare and present evidence about the character and value of the property is one reason the court did not find good cause for an evidentiary hearing on interim fees."

The court also found that the resolution of the issues in this case requires the use of experts. Neither of these findings is challenged by Robert on appeal. From our review of the record on appeal, we agree with the circuit court that resolution will likely require the use of experts to untangle the complex nature of Robert's and the parties' holdings (for example, Robert owns, in whole or part, approximately 20 parcels of real estate, some in limited liability companies, each with different operating agreements, each with different owners and different rental cash flows), and Robert controls the information regarding the finances.

¶ 31     The extensive use of experts at an interim fee petition stage, as would be required here, is contrary to the statutory requirement that the interim fee hearing be nonevidentiary and summary in nature. Robert has failed to allege sufficient good cause to overcome the statutory standard that "a proceeding for (or relating to) interim attorney's fees and costs in a pre-judgment dissolution proceeding shall be nonevidentiary and summary in nature." 750 ILCS 5/501(c-1)(1) (West 2010). The circuit court properly determined there was no good cause to conduct a hearing.

¶ 32     Robert's reliance on *In re Marriage of Radzik*, 2011 IL App (2d) 100374, for the proposition that the circuit court in this case should have held a hearing does not persuade us differently, as *Radzik* is inapposite to the case at bar. In *Radzik*, also a dissolution of marriage case, the petitioner filed a petition for interim fees and a financial affidavit, but attached no other relevant supporting documents. *Id.* ¶ 6. The only other documents attached to the petition were petitioner's attorney retainer agreement and her attorneys' affidavits establishing their respective education, experience, and billing rates. *Id.* Subsequently, the petitioner filed a second interim fee petition, but attached no further documents. *Id.* ¶ 11. In response, respondent alleged he was unable to pay petitioner's requested fees due to expenses he had incurred as a result of the litigation. *Id.* The circuit court awarded interim fees to the petitioner. *Id.* ¶ 17. The respondent was later held in indirect civil contempt for failing to pay the ordered fees. *Id.* ¶ 31. On appeal, the Second District of this court reversed the interim fee award, finding the trial court received "virtually no evidence regarding respondent's present ability to pay the amount that the court awarded." (Emphasis omitted.) *Id.* ¶ 51. Specifically, the court found, in pertinent part, that the petitioner's financial affidavit was outdated and inaccurate, and that her petition for fees merely contained general allegations that she could not afford to pay fees, but respondent could afford to do so. *Id.* ¶ 49. The court held: "On this record, where the trial court had reason to believe that the minimal support provided for the fee request might be inaccurate, petitioner failed to meet [the burden of showing the other party's ability to pay]. At a minimum, we think that good cause was shown

to hold an evidentiary hearing." *Id.* ¶ 51. In addition, the circuit court had ordered the interim fees paid from an IRA, and the reviewing court determined that "there is no authority for a trial court to order the liquidation and distribution of an IRA to satisfy an attorney fee award." *Id.* ¶ 62.

¶ 33 In the present case, the interim fees awarded were not ordered to be paid from a liquidated IRA or any other retirement account. In addition, the *Radzik* court's concern in reversing and ordering an evidentiary hearing was that the petitioner had not included supporting documentation that the respondent could pay the requested interim fee award, and the court had reason to believe the minimal documentation provided was "inaccurate." *Id.* ¶ 49. These concerns are not present in the case at bar. Rather, Robin supported her motion for interim fees with substantial documentation.[4] Robert's reliance on *Radzik* is unpersuasive.

¶ 34 Turning to the merits of the court's interim fee award determination, we find no abuse of discretion in the interim award of $78,500. For purposes of a section 501(c-1) petition, the party seeking fees must demonstrate the inability to pay and the ability of the other party to pay both parties' fees. 750 ILCS 5/501(c-1)(3) (West 2010). In divorce decree proceedings, we review the award of attorney fees for an abuse of discretion. *In re Marriage of Beyer*, 324 Ill. App. 3d at 320; *In re Marriage of Cierny*, 187 Ill. App. 3d 334, 347 (1989). An abuse of discretion occurs only when no reasonable person would take the view adopted by the court. *In re Marriage of Benkendorf*, 252 Ill. App. 3d 429, 432-33 (1993). A reviewing court should examine whether the trial court "acted arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." *In re Marriage of Aud*, 142 Ill. App. 3d 320, 326 (1986).

¶ 35 Robert contends the circuit court erred in granting an interim award because the petition and the subsequently filed supporting documents failed to adequately demonstrate his ability to pay Robin's attorney fees. However, a review of Robin's financial disclosure affidavit and Robert's financial disclosure affidavit, as well as the supporting documents both parties filed therewith, does not support Robert's argument. On reconsideration of the petition for interim and prospective attorney fees and costs, the court ordered the parties to submit numerous financial documents for the court's review. In response to the court's order, Robert filed

---

[4]We note for the record that we are wary of the way Robert has argued this issue on appeal. Specifically, in the statement of facts found in his opening brief on appeal, Robert states that each party submitted a financial disclosure statement to the circuit court when ordered to do so, but then states, "[n]o other documents were submitted to the court." This was a clear misrepresentation of the record, as approximately 154 pages of supporting documents were submitted to and reviewed by the circuit court before it issued the order at issue here. Robert did not include these documents in the record filed with his appeal. After Robin brought this to the attention of Robert's counsel and the court, the parties supplemented the record with the relevant documents. In his reply brief, Robert acknowledges the error and "retracts that statement." Nonetheless, it appears that much of the reasoning behind Robert's argument that *Radzik* is similar to the case at bar was based on the mistaken understanding that Robin's petition, like the petition in *Radzik*, was unsupported by documentation. It was not.

several documents, including: a memo describing his financial situation, including a description of assets available to pay for ongoing litigation costs; an updated financial disclosure statement; addendum lists of marital assets and liabilities, premarital and nonmarital assets; Robert's projected annual income statement; a table showing the parties' cash or cash equivalents; a table showing the parties' liabilities; a statement of contingent liabilities; a table reflecting attorney fees for both parties regarding the dissolution litigation; Robert's 2010 tax returns; a statement of liabilities; a statement of assets; a statement of business interests reflecting loans advanced by Robert to affiliated real estate limited liability companies; Robert's business monthly income and expense statement; a statement reflecting rental income for 2009-10; and a table showing real estate owned (both individually and in various shared ownership situations).

¶ 36      For her part, Robin submitted an updated financial disclosure statement as well as a memorandum in support of her petition for interim fees, which included: a table showing attorney and expert fees and costs due and paid by both parties; a section explaining that Robin did not have the ability to pay attorney and expert fees and costs, which included the statement that Robin had already liquidated her nonmarital IRA to pay attorney fees; as well as a table showing the "balance of funds Robin has received to supplement her income"; a section purporting to show that Robert had the ability to pay the attorney fees and costs, which noted that Robert's net worth in May 2011, as reflected in his personal financial statement, was $1,737,000; and including a table reflecting properties in which Robert maintains an interest. In addition, Robin provided Robert's financial statement he made with First Eagle Bank dated May 1, 2011, in which he reported having a net worth of $1,737,000, as well as another of Robert's personal financial statements dated April 15, 2010, in which he reported having a net worth of $8,909,000.

¶ 37      A review of Robin's financial disclosure affidavit indicates the balance between her income and expenses established she was unable to pay her own fees. By way of example, Robin, a homemaker and full-time caretaker of the couple's two children, reported in her disclosure statement submitted to the court that her gross income from all sources during the past year was $1,545. Her monthly living expenses, on the other hand, totaled $25,361. She alleged that Robert was in control of all financial matters in the household. In her petition and affidavit, Robin further alleged that Robert had the ability to pay both her and his own attorney fees because he had access to various sources of income from multiple properties, he had numerous business interests, and he has access to or control of substantial assets and income.

¶ 38      In Robert's disclosure statement, he reported a net monthly income of $12,666, but reported that his monthly expenditures exceeded that amount. The circuit court noted that Robert "solely controls the alleged marital property" and has not accessed his alleged nonmarital assets to pay attorney and expert fees. Robin, on the other hand, has accessed her alleged nonmarital property to pay attorney fees, specifically: "a retirement asset, receiving $37,258.52, and paying $32,500, with a large portion taken for taxes and penalties, and a savings account, receiving and paying approximately $46,000." The court acknowledged that, based on the litigiousness exhibited thus far, the parties would need a great deal more money to finance the litigation of this dissolution. The court noted: "[Robin] has spent more

-14-

so far, but she is not the party in control of the marital assets and the information about them. The undisputed pattern here is that [Robert] alone supports the family financially."

¶ 39    In addition, as to section 501(c-1)(1)(C), the realistic earning capacity of each individual, the court found that, currently, Robin's earning capacity is low as the primary caregiver of two young children with special needs, while Robert's earning capacity is high.

¶ 40    As to section 501(c-1)(1)(E), the standard of living established during the marriage, the court found that the couple had established a wealthy lifestyle and the litigation expenses incurred during the dissolution have been consistent with the marital lifestyle. The court noted: "Although they may say otherwise, the only reasonable inference from the parties' conduct is that they both believe that the marital estate has sufficient assets to finance their litigation. [Robert], not [Robin] controls the marital assets."

¶ 41    As to section 501(c-1)(1)(F), the degree of complexity of the issues, the court found that this case "involves complex issues that require experts." We agree with this assessment, and note the following complex issues: there are contentious child custody issues involving children with special needs; the precise valuation of the estate in question requires the use of experts to untangle the complex nature of Robert's holdings (for example, Robert owns, in whole or part, approximately 20 parcels of real estate, some in limited liability companies, each with different operating agreements, each with different owners and different rental cash flows); and Robert controls the information regarding the finances.

¶ 42    The circuit court acknowledged that, as of February 12, 2012, Robin's attorneys had been paid more than Robert's attorneys. It noted that attorney fees and child representative fees have been paid from tax refund income ($108,000), "other" income ($12,995), credit cards ($14,750), loans from both Robin's family ($10,000) and Robert's family ($11,750), and Robin's alleged non-marital assets ($78,500).

¶ 43    As to section 501(c-1)(1)(I), any other factor the court expressly finds to be just and equitable, the court found:

> "It is just and equitable to consider the following additional factors: (1) regardless of the liquidity of the marital property it must and will be divided equitably by agreement or by the court, meaning that specific property, or cash in lieu of specific property, will be transferred to Petitioner from Respondent, (2) it is impossible to determine at this point what, if any, portion of the tax refunds which have been used to support the marital lifestyle and to pay about $108,867 of attorneys' and experts' fees, may be characterized as Respondent's non-marital property, (3) Petitioner spent at least $78,500 from alleged non-marital savings and retirement for fees, (4) Respondent has at least $78,500 in alleged non-marital assets which are not liquid, but, which, in light of Respondent's experience and profession, he may access indirectly, and (5) both parties have demonstrated the ability to obtain loans from family members."

¶ 44    Additionally, although the circuit court did not hold an evidentiary hearing in this cause, it was familiar with the case and the parties. In fact, as of the date of the order in question, March 16, 2012, the parties had been in front of the court during these dissolution proceedings on 48 separate occasions. By way of illustration regarding the court's familiarity with the parties and their finances, Robin directs this court to various documents included

in the record on appeal, including a motion filed with the circuit court in which Robert requested an order of the court to allow the parties' children to attend a private grammar school and assuring the court that Robert and his family would pay the annual tuition of $40,000.

¶ 45    We find no abuse of discretion in the circuit court's order of $78,500 in interim fees. It properly considered all of the statutory factors, was familiar with the case and the parties before it, and reviewed a bevy of financial information submitted by the parties prior to making its determination. Robert was the party with better financial ability to pay the fees, and the court so ordered.

¶ 46    Robert urges us to find that the court misapplied section 501(c-1)(3) and the legal concepts of "leveling the playing field" and finding "substantial parity" between the parties. In support of his argument, Robert cites to *In re Marriage of Beyer*, 324 Ill. App. 3d at 315, in which this court stated that, "In enacting section 501(c-1), the legislature's goal was to level the playing field by equalizing the parties litigation resources where it is shown that one party can pay and the other party cannot." Robert argues that the court misapplied these concepts, in large part because Robin's attorneys had been paid more than had Robert's attorneys. We disagree. In its memorandum order, the circuit court addressed each factor, spending over two pages analyzing the factors outlined in section 501(c-1). In addition, as the statute allows, the court addressed "any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/501(c-1)(1)(I) (West 2010). In its order, the court properly addressed the fact that Robin's attorneys had been paid more than had Robert's in its discussion of subsection H. Subsection H, which represents but one factor the court reviewed of many, provides for the analysis of payments made and expected to be made. The circuit court clearly addressed this issue in the order, and considered not only the payments that had already been made, but the source of those payments, as well. Allowing a party to not pay reasonable interim attorney fees in a situation such as that found in the case at bar solely because the other party previously paid more to her attorneys, without further analysis, would be unjust and would contravene the purpose of the interim fees statute.

¶ 47    In sum, we cannot say that it was an abuse of discretion to grant the interim award. We remind the parties that this interim award is merely an advance from the marital estate, which estate will be equitably divided at the time of dissolution. See 750 ILCS 5/501(c-1)(2) (West 2010); see also *In re Marriage of Radzik*, 2011 IL App (2d) 100374, ¶ 43 ("An interim fee award is deemed an advance from the parties' marital estate, and any portion of an interim award constituting an overpayment shall be remitted back to the appropriate person or party.").

¶ 48                                    B. The Contempt Order

¶ 49    Next, Robert contends the circuit court erred in its contempt finding and the subsequent sanctions entered against him. Specifically, Robert argues that, where he did not have the opportunity to purge himself of the contempt, *i.e.*, because he did not have access to the necessary funds to do so, the court acted "in direct contravention of its contempt powers."

¶ 50    Initially, Robin responds that, in fact, this court lacks jurisdiction to decide this appeal

-16-

because Robert filed his notice of appeal too soon.[5] She argues that, because only contempt orders which impose a penalty or sanction are final and appealable, and the instant contempt order did not impose a penalty or sanction, it was not appealable at the time Robert filed his notice of appeal. See *Revolution Portfolio, LLC v. Beale*, 341 Ill. App. 3d 1021, 1026 (2003) (noting that in order for the appellate court to assume jurisdiction under Illinois Supreme Court Rule 304(b)(5) (eff. Feb. 1, 1994), the contempt order must impose sanctions of some kind upon the contemnor).

¶ 51 The circuit court issued a contempt order on June 4, 2012, which stated:

"This cause coming on to be heard after return of the rule entered against Robert Levinson April 3, 2012, both parties appearing by counsel, Robert offering no defense and seeking 'a friendly contempt' and over objection of Robin's counsel as to the 'friendly' contempt, the court hearing argument and being fully advised, ORDERED:

(1) Robert Levinson is found in indirect civil contempt of court for his wilful failure to comply with the court order of 2/16/12 (2) He may purge the contempt by paying to Lake Toback $78,500 within 14 days (3) setting of sanctions is continued to 6/20/12."

Robert then filed a notice of appeal on June 6, 2012. Robin contends that this notice of appeal was premature. However, our review of the record shows that the court intended the purge amount of $78,500 in the contempt order to be a sanction because on June 20, 2012, the court entered a subsequent order finding that the purge amount "is a sanction."[6] The trial court did not "convert" the purge amount into a sanction, as Robin argues. Rather, the trial court *clarified* that it intended the purge amount, from the beginning, *i.e.*, from June 4, 2012, the day the contempt order was entered, to be a sanction. Accordingly, this court is properly vested with jurisdiction.

¶ 52 We now turn to the merits of the contempt order. A court has the authority to enforce its orders by way of contempt. *In re G.B.*, 88 Ill. 2d 36, 41 (1981). Civil contempt proceedings are coercive, that is, the civil contempt procedure is designed to compel the contemnor perform a specific act. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43 (1990). "Civil contempt proceedings have two fundamental attributes: (1) the contemnor must be capable of taking the action sought to be coerced, and (2) no further contempt sanctions are imposed

---

[5]In this court, Robin filed a motion to dismiss cause number 1-12-1696 for lack of jurisdiction. We took the motion with the case and hereby deny said motion.

[6]Specifically, the court order states:
"The court finds that the purge amount in the 5/30/12 order is a sanction and hereby denies Robert's request for stay for the reasons set forth and transcribed in open court."
The May 30, 2012, order states:
"The court has been advised that Robert is requesting a contempt citation on the matter set for hearing on 6/4/12, counsel for Petitioner indicating that he wants to be heard on that date."
The contempt order in question was not entered until June 4, 2012. However, it is clear from the record that the trial court, when referring to the "purge amount in the 5/30/12 order" was actually referring to the June 4 order.

upon the contemnor's compliance with the pertinent court order." *In re Marriage of Sharp*, 369 Ill. App. 3d 271, 279 (2006). "The power to enforce an order to pay money through contempt is limited to cases of wilful refusal to obey the court's order." *In re Marriage of Logston*, 103 Ill. 2d 266, 285 (1984). Whether a party is guilty of contempt is within the sound discretion of the trial court, and we will not reverse a trial court's determination absent an abuse of discretion. *In re Marriage of Sharp*, 369 Ill. App. 3d at 279.

¶ 53    The record on appeal contains sufficient evidence to support the circuit court's determination that Robert's failure to comply with the order was wilful and contumacious. Contrary to Robert's argument that he was unable to pay the money and, therefore, his noncompliance was not wilful and contumacious, as addressed above, the trial court properly found that Robert had the ability to comply with the court's order that he pay $78,500 in interim attorney fees.

¶ 54    Robert argues that the indirect civil contempt was, in fact, a "friendly contempt." He supplemented the record on appeal with the transcript of the June 4, 2012, contempt hearing. We acknowledge that, in the contempt hearing, the trial court does refer to the contempt as a "friendly contempt." However, in the written contempt order, the court specifies that "Robert Levinson is found in indirect civil contempt of court for his wilful failure to comply with the court order of 2/16/12."

¶ 55    This court has previously addressed a similar situation and rejected a similar argument in *Willeford v. Toys "R" Us-Delaware, Inc.*, 385 Ill. App. 3d 265, 277 (2008), wherein the defendants requested that the court, having ruled against them on the merits, vacate the trial court's "friendly contempt" finding because it was entered against the defendants merely to allow them to challenge certain discovery issues immediately. *Id.* The court rejected the request, in part because while the trial court orally announced it was granting a "friendly contempt," the written order actually did not specify that it was a "friendly contempt." *Id.*

¶ 56    We recognize that "exposing oneself 'to a finding of contempt is an appropriate method of testing the validity of a court order,' " particularly "where the refusal to comply with the court's order constitutes a good-faith effort to secure an interpretation of an issue without direct precedent." (Internal quotation marks omitted.) *In re Marriage of Radzik*, 2011 IL App (2d) 100374, ¶ 67 (quoting *In re Marriage of Rosenbaum-Golden*, 381 Ill. App. 3d 65, 82 (2008), quoting *In re Marriage of Beyer*, 324 Ill. App. 3d at 321); accord *In re Marriage of Nash*, 2012 IL App (1st) 113724, ¶ 30. However, in the case at bar, Robert does not challenge a unique area of law or present a good-faith effort to secure an interpretation of an issue without direct precedent. Instead, Robert attempts to circumvent the directives of the Act, which specifies:

> "(d) A temporary order entered under this Section:
> ***
> (2) may be revoked or modified before final judgment, on a showing by affidavit and upon hearing; and
> (3) terminates when the final judgment is entered or when the petition for dissolution of marriage or legal separation or declaration of invalidity of marriage is dismissed." 750 ILCS 5/501 (d)(2), (3) (West 2010).

-18-

The Act does not allow for parties to generally test the validity of interim fee awards under the guise of a "friendly contempt" merely because the party does not agree with the award.

¶ 57    Nevertheless, we find error in the circuit court's contempt order. First, the court erred when it designated the contempt at issue "indirect civil contempt." In our view, the contempt at issue was *direct* civil contempt because the contumacious behavior at issue, *e.g.*, Robert's refusal to pay the court-ordered interim attorney fees, occurred directly in front of the court. See *In re Marriage of Slingerland*, 347 Ill. App. 3d 707, 711 (2004) ("direct contempt arises from conduct that occurred in the judge's presence, making all elements of the offense within the judge's personal knowledge"); see also *Levaccare v. Levaccare*, 376 Ill. App. 3d 503, 508-09 (2007) ("A direct contempt is a contempt committed in the presence of the court while the court is in session, as opposed to an indirect contempt that is committed outside the presence of the court."). Robert, by counsel, in court, openly refused to comply with the court's interim fees order. This conduct occurred within the court's presence, and all elements of the offense were, therefore, within the court's personal knowledge. Accordingly, Robert should have been held in direct civil contempt.

¶ 58    In addition, the court erred in substituting the purge amount of $78,500, which was the amount of the underlying interim fees order, for contempt sanctions. The purpose of the circuit court imposing sanctions, *i.e.*, an indefinite and continuing fine and/or jail sentence, until purged by compliance, is to coerce Robert to comply with the initial order. See *In re Marriage of Betts*, 200 Ill. App. 3d at 43-44 (the purpose of imposing sanctions in a civil contempt action is to compel the contemnor to perform a particular act). Here, reviewing the contempt order in combination with the subsequent court order clarifying that the purge amount was a sanction, it appears the court intended the purge amount–the amount of the interim fees order–to act doubly as a purge amount and as a fine or sanction. This was error.

¶ 59    We acknowledge that Robert's behavior was wilful and contumacious. Even though, as we have found herein, he had the ability to comply with the court's interim fees order, he refused to do so. Nonetheless, due to the infirmities in the contempt order itself, we vacate the order finding him in indirect civil contempt. Robert is still required to comply with the interim attorney fee order and, as this cause continues forward, noncompliance on his part may merit a subsequent finding of contempt.

¶ 60                                    III. CONCLUSION

¶ 61    For the foregoing reasons, we affirm the interim attorney fees order and vacate the order holding Robert in indirect civil contempt.

¶ 62    The decision of the circuit court of Cook County is affirmed in part and vacated in part.

¶ 63    Affirmed in part and vacated in part.